**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOYCE DANIELS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 18-1019 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| CITY OF PITTSBURGH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

Plaintiff, the administrator of the estate Mark Daniels ("the Decedent"), indicates that "[t]his case concerns one of the most fundamental and pressing questions facing urban policing and our society, namely:  Why do the police continue to kill unarmed African-American males?"  Doc. 98.  In light of numerous reported high-profile incidents, involving problematical cases of excessive and disproportionate force, many citizens in this Country have been asking similar questions.

This does not mean, however, that the question arises every time law enforcement uses deadly force.  Officers, when faced with conduct posing a serious, immediate threat to themselves and to public safety, must be allowed to respond commensurately.  Such is often the case when an individual wields a firearm against police officers and then flees.

In the early morning hours of February 11, 2018, City of Pittsburgh Officers Gino Macioce and Kevin Kisow observed an individual leaving Betts Market who appeared, according to the officers, to be acting suspiciously.  The officers pursued the individual, and encountered him on a nearby street.  Officer Macioce saw that the individual had a gun in his hand, raised to

fire.  *See* Doc. 92-3 at ECF banner pgs. 7-8 of 37; *see also* Doc. 116-5 (sworn affidavit of Officer

Macioce, confirming the veracity of his statements in a videotaped interview recorded shortly

after the incident).[1]  The two exchanged gunfire, "pretty simultaneous[ly]," neither were hit and

the individual fled.  *See* Doc. 92-3 at pg. 8 & 26 of 37.[2]

The officers again went in pursuit, and they encountered the individual who shot at them

standing on a corner, speaking with a female.  *See* Doc. 99-2 at pgs. 52-53 of 92.

Officer Macioce pointed his gun at the individual, and repeatedly commanded that he get on the

ground.  Doc. 100 at ¶ 53 (Plaintiff's response to Defendants' facts).  The individual did not

comply and, in response to the verbal commands, said, "It wasn't me.  It wasn't me."  *Id.*

Then, he "turn[ed] to run."  *Id.* at ¶ 66.

Officer Macioce shot four times, striking the fleeing individual once in the arm.

*See generally id.* at ¶ 83.  The bullet hit an artery, and the individual died.  As might be deduced

from the narrative above, the individual was Decedent, Mark Daniels.

The police recovered a firearm from the crime scene, and the firearm was traceable to

Decedent.  The purchaser of the firearm later was identified, and she stated that she bought it for

Decedent because "he could not purchase firearms" for himself.  Doc. 116-2.  Also recovered

from the crime scene were bullet fragments and cartridge cases matching the firearm.

Doc. 116-6; *see* Doc. 100 at ¶¶ 87-90 (stating only general objections to Defendants' evidence,

---

[1] Plaintiff's objection to Defendants' reliance on Officer Macioce's videotaped statement, and to
later witness statements, is unfounded.  Contrary to Plaintiff's indication, the statements in
question are supported by confirmatory sworn affidavits.  *See* citation *supra*, in body of text;
*see also, e.g.*, Doc. 116-2 (affidavit of Detective Steven Hutchins, swearing to the veracity of his
report regarding the purchaser of the firearm found on the scene).

[2] Officer Kisow was not involved in the exchange of gunfire, having – during the shooting –
fallen to the ground.  Doc. 100 at ¶ 40 (Plaintiff's response to Defendants' facts).

rejected above in fn. 1, and otherwise, offering only conclusory denials, without reference to contrary evidence).

Defendants have put forth evidence, essentially unrefuted, that Officer Macioce identified Decedent as the individual who exchanged gunfire with him only minutes earlier. Other evidence (albeit discovered after the fact), corroborates Officer Macioce's account, tying the recovered firearm to Decedent, and bullet fragments to the firearm. While Plaintiff's counsel flirt with − if not outright advance – the notion that the officers had "the wrong man," a jury could not *reasonably* so-conclude based on the record in its entirety.[3]

In sum, Plaintiff has not successfully refuted Defendants' evidence that Decedent was the individual who engaged in a contemporaneous exchange of gunfire with Officer Macioce.[4] Even placing aside the forensic evidence confirming the Officer's account, the Court nevertheless would conclude that Plaintiff has failed to sufficiently refute Defendants' evidence that Officer Macioce had an objective, reasonable belief that Decedent had threatened him with deadly force.

---

[3] Plaintiff's counsel also suggests that Officer Macioce essentially "ambushed" the heretofore unknown individual, having not announced that he was a police officer, and having fired first. *See, e.g.*, Doc. 99 at ¶¶ 55-56 ("Defendant Macioce fired two unprovoked shots"). In addition to straining credulity, counsel's "evidence" in support is, in fact, consistent with Officer Macioce's account. The Officer's sworn statement was that the individual with whom he exchanged gunshots had a firearm in his hand, raised to fire. *See* discussion *supra*; *see also id.* (describing gunfire as "simultaneous"). Whether Officer Macioce, or the assailant, fired first is immaterial for the purposes of the discussions herein.

[4] The Court finds curious Plaintiff counsel's reliance on, and/or admission that, Decedent's first response to Officer Macioce's commands was to say, "It wasn't me. It wasn't me." *See* discussion *supra* in text. Such a statement begs the question: if Decedent was not involved in the prior incident, in what context would such a reaction be logical? Although the Court need not, and does not, rely on this evidence in granting summary judgment, it does serve to emphasize the seeming implausibility of counsel's narrative.

The questions that remain are legal ones, namely:  was Officer Macioce's use of force not excessive as a matter of law?  And, in any event, is the Officer protected by qualified immunity?  The answers both are in the affirmative.

The Court of Appeals for the Third Circuit recently reiterated the governing standards:

> [T]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .  [T]he question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. . . .  [T]he Supreme Court [has] held that deadly force is not justified in circumstances where a fleeing suspect poses no immediate threat to the officer and no threat to others. . . .

> [A]dditional factors . . . include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight. . . .  Other relevant factors are the physical injury to the plaintiff, the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

Jefferson v. Lias, 21 F.4th 74, 78-79 (3d Cir. 2021) (citations, quotations and internal punctuation and alterations omitted).[5]

Many of the listed factors go hand-in-hand with the considerations in this case.  The Supreme Court's recognition that deadly force is not justified where a fleeing suspect poses no immediate threat to the officer, or others, is inapplicable.  Irrespective of whether Decedent

---

[5] To be sure, the Jefferson Court noted that reasonableness normally is an issue for the jury, and it reversed the district court's grant of summary judgment.  *See generally id.*  Jefferson's ultimate rulings are facially distinguishable, however, as is obvious based on the Circuit Court's central premise:  "[A] suspect fleeing in a vehicle, who has not otherwise displayed threatening behavior, has the constitutional right to be free from the use of deadly force when it is no longer reasonable for an officer to believe his or others' lives are in immediate peril from the suspect's flight." *Id.* at 81.  That scenario is a far cry from this one, where Officer Macioce had an objectively reasonably belief that Decedent had fired on him minutes prior.

still had a weapon at the time of the final confrontation, Officer Macioce believed him to have

fired shots on officers minutes before.  Contrary to Plaintiff counsel's suggestion, the law did not

require the Officer to "see the gun" one more time, before he could return force in kind.  <u>Lamont</u>

<u>v. New Jersey</u>, 637 F.3d 177, 183 (3d Cir. 2011) ("An officer is not constitutionally required to

wait until he sets eyes upon [a] weapon before employing deadly force to protect himself against

a fleeing suspect who . . . moves as though to draw a gun.  Waiting in such circumstances could

well prove fatal[, and p]olice officers do not enter into a suicide pact when they take an oath to

uphold the Constitution.").[6]

The other factors likewise compel a finding of reasonableness:

•        The severity of the crime at issue, shooting at police officers, cannot be much greater.

•        Whether the suspect poses an immediate threat to the safety of the officers or others,

the same.

•        Whether he actively is resisting arrest or attempting to evade arrest by flight, the latter

is true in this case.

•        Physical injury to the plaintiff is a non-factor, as Officer Macioce's having hit Decedent

in the arm is, in the Court's view, happenstance (as was the significant misfortune of an arm

wound proving fatal).

---

[6] Officer Macioce's sworn statements are that, at the time of Decedent's noncompliance,
and before he turned to run, his fleece jacket was bulged, there appeared to be something in
the front and "it looked like he was either grabbing or reaching or grabbing something in front of
him."  Doc. 92-3 at pgs. 10-11 of 37.  Given the Officer's belief that Decedent already fired
on him, the Court does not believe such testimony is necessary.  *See, e.g.*, <u>Embaye v.</u>
<u>Minneapolis Police Dep't</u>, 2016 WL 3960374, *9-10 (D. Minn. Jun. 22, 2016) (the plaintiff's
claim that he discarded his weapon was not "a material fact affecting the determination of
reasonableness," because the officer employing deadly force had knowledge that the plaintiff had
"previously fired his weapon" at a *different* officer).

•      The possibility that the person subject to the police action was violent or dangerous, again is a given.

•      The duration of the action, it is undisputed that the exchange of fire and the subsequent encounter transpired exigently, within a matter of minutes.

•      Whether the action takes place in the context of effecting an arrest, Decedent's arrest was imminent had he complied with the officers' commands.  *See* Doc. 99-2 at pgs. 50-51 of 92 (indicating that Officer Kisow also issued verbal commands).

•      The possibility that the suspect may be armed, also favors reasonableness.  Although Plaintiff's counsel urge that the officers were required to "see the gun" one more time, in light of the prior shooting, the Court cannot agree.

•      The number of persons with whom the police officers must contend at one time, is a non factor.

       A balance of the relevant factors firmly establishes a lack of excessive force, as a matter of law.  This is consistent with the precedent.  *See, e.g.*, Blair v. City of Pgh., 711 Fed. Appx. 98, 100-101 (3d Cir. Sept. 28, 2017) (reaching same conclusion, albeit within the context of qualified immunity, where the officers heard gunshots nearby and pursued the shots, only to see an SUV driving at their marked police van; one of the officers saw the vehicle's driver continuing fire, and the officers fired even after the fleeing vehicle sped away); Gravely v. Speranza, 219 Fed. Appx. 213, 215 (3d Cir. Mar. 5, 2007) (affirming grant of summary judgment where, among other things, the plaintiff "had car-jacked a vehicle and placed a machine gun to the head of the driver moments before he was shot and arrested"); Gallardo v. County of San Luis Obispo, 2021 WL 4796538, *3 (9th Cir. Oct. 14, 2021) (same, where the plaintiff drew a gun from his pocket and pointed it toward the officer and ignored commands to cease;

when "a suspect threatens an officer with a weapon such as a gun, the officer generally is

justified in using deadly force") (internal quotations and citation to quoted source omitted);

Siler v. City of Kenosha, 957 F.3d 751, 759-60 (7th Cir. Apr. 29, 2020) (same, where the

plaintiff defied the officer's command, dared the officer to shoot him and then, while holding

something in his hand not visible to the officer, stepped in his direction; the "temporal focus

must remain on what [the o]fficer knew at the time he shot," and the officer "had the right to

protect himself and . . . bystanders through the use of deadly force"); Williams v. City of

Chattanooga, 772 Fed. Appx. 277, 280-82 (6th Cir. May 15, 2019) (officer acted reasonably

when firing a second volley, in a "tense [and] uncertain" situation, and where the officers

"could have reasonably believed that [the plaintiff] posed a threat to their safety or the safety of

others"); Garrett v. Ruiz, 2013 WL 1342850, *14 (S.D. Cal. Apr. 3, 2013) (granting summary

judgment, and analogizing to a case finding that the officers acted reasonably where "they shot a

residential burglary suspect who had previously shot a hostage, who eluded capture for almost an

hour by running across yards and streets, and jumping fences, but was unarmed when

apprehended"), aff'd, 585 Fed. Appx. 348 (9th Cir. Oct. 7, 2014) (deadly force was reasonable

because the plaintiff "was apprehended during the course of a night-time burglary, [he] admitted

he was armed with a knife and was attempting to evade arrest by flight, and the events happened

very quickly"); Long v. Honolulu, 511 F.3d 901, 906-907 (9th Cir. Dec. 21, 2007) (same, where

officer "heard [the plaintiff] threaten to shoot the police, observed him carrying a .22 caliber rifle

and knew that he had previously shot at a car full of people") Embaye, 2016 WL 3960374

at * 9-10 (cited *supra*); Wood v. Farmington, 910 F.Supp.2d 1315, 1326 (D. Utah 2012) (same, where the plaintiff, among other things, refused repeated commands to drop his weapon, made hostile motions with his gun and previously had fired it).[7]

In light of the aforementioned legal authority,[8] it is unsurprising that Officer Macioce also enjoys qualified immunity. As already seen, Defendants have shown that there was no violation of a constitutional right. Plaintiff also cannot show a violation of clearly established law. As long has been the case, "[w]here [an] officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Tennessee v. Garner, 471 U.S. 1, 11-12 (1985).

The Court rejects Plaintiff's counter-formulation of the right(s) in question. Counsel posits that the specific right violated was "Decedent's right to be free from the use of deadly force while running away from a police officer, when he did not pose any articulable

---

[7]  Plaintiff's reliance on Curley v. Klem is misplaced. *Id.*, 499 F.3d 199 (3d Cir. 2007). Curley involved a case of blatant, if not reckless, misidentification, where the police officer shot at the plaintiff merely because he matched the description of the perpetrator being a "tall, black male." *Id.* at 201-202. The plaintiff was a port authority police officer, wearing his uniform, who was investigating the scene when the defendant state trooper shot him. *See id.* It is unsurprising that a grant of summary judgment would be reversed on those facts. Here, Officer Macioce had an objectively reasonably belief that Decedent was the same person who fired at him minutes earlier. And, of course, there is the unrefuted, corroborating evidence tying a firearm to Decedent, and bullet fragments to the firearm. In any event, Curley is distinguishable.

[8]  The Court acknowledges, and has accounted for, legal precedent recognizing that summary judgment should be applied cautiously in deadly-force cases, because the victim is unable to testify. *See* Lamont, 637 F.3d at 181-82. The Court of Appeals for the Third Circuit has made clear, however, that heightened summary judgment standards do not apply; and it certainly has affirmed summary judgment in appropriate circumstances. *See id.* (affirming grant of summary judgment regarding the initial use of deadly force in the case before it).

threat, was not visibly armed, and there was no probable cause to believe he was involved in an earlier shooting." *See* Doc. 98 at 7.

Obviously, Plaintiff's formulation bears little resemblance to the facts and determinations above. Most of the arguments "baked in" already have been rejected, either directly or by implication. A point warranting further comment, however, is Plaintiff's suggestion that "probable cause" is relevant. Along the same lines, counsel flirts with the no+tion that the officers lacked reasonable suspicion to pursue and intercept the presumably unknown subject exiting Betts Market. *See id.* at 4-5.

As to the first point, it is important to note that the Supreme Court in <u>Garner</u> stated: "<u>[I]f the suspect threatens the officer with a weapon *or* there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm</u>, deadly force may be used if necessary to prevent escape." *Id.*, 471 U.S. at 11-12 (emphases supplied). Officer Macioce already has been determined to have had an objectively reasonable belief that Decedent fired on him; and his belief has been corroborated by crime-scene and other evidence. Of course, firing on police officers is grounds for probable cause, but framing the issue as such is distracting and unnecessary.

As to reasonable suspicion, Plaintiff's counsel understandably tread carefully in this area, given their insinuation that the officers, at all times, had "the wrong man." To claim that the person exiting Betts Market was not Decedent – and that the officers lacked reasonable suspicion to pursue *any* individual who did − raises the specter not only of standing, but concerns against talking out of both sides of one's mouth.

In the end, such ruminations are neither helpful nor necessary. The unrefuted evidence establishes that the officers pursued an individual, and that an individual fired a weapon at them

shortly thereafter.  There is no competent evidence refuting Officer Macioce's belief, later corroborated, that the individual who shot at him was Decedent.  By the time of the fire-fight, any causal link between the officers' surveillance near Betts Market and the final, unfortunate incident had long been severed.

For all of the reasons stated above, Officer Macioce is entitled to summary judgment. Given the lack of underlying liability, the *Monell* claims against the City likewise fail. Johnson v. City of Philadelphia, 837 F.3d 343, 354 n.58 (3d Cir. 2016) (citation omitted).

Consistent with the foregoing, the Court hereby enters the following:

## II.  ORDER

Defendants' Motion for Summary Judgment (**Doc. 90**) is **GRANTED**, and this case will be marked closed.

IT IS SO ORDERED.


March 30, 2022                                     s\Cathy Bissoon
                                                   Cathy Bissoon
                                                   United States District Judge

cc (via ECF email notification):

All Counsel of Record